**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. JRR-26-073** |
| | * | |
| **COREY POLLARD** | * | |

**RESPONSE IN OPPOSITION TO THE GOVERNMENT'S
MEMORANDUM IN SUPPORT OF MOTION FOR REVOCATION OF A
MAGISTRATE JUDGE'S RELEASE ORDER**

Mr. Pollard has been charged with alleged violations of his supervised release stemming

from a misdemeanor trespass case pending in the Montgomery County District Court—an offense

that, if proven, carries a maximum term of imprisonment of 90 days in the State and would trigger

a Grade C violation in this Court.   After hearing extensive arguments from Mr. Pollard, the

Government, and Probation, U.S. Magistrate Judge Charles D. Austin ordered Mr. Pollard's

release with restrictive conditions to include home detention with location monitoring, travel

restrictions, and a requirement that he be held in custody until the Probation Office approves his

residence. *See* ECF No. 9.  That Order followed Magistrate Judge Austin's finding that Mr. Pollard

met his burden of establishing by clear and convincing evidence that he would not flee or pose a

risk of danger based on:

- **Mr. Pollard's longstanding ties to Maryland**;

- **Mr. Pollard's history of employment.**  As noted in the Presentence Report ("PSR") attached to the Government's Memorandum, *see* ECF No. 15.1, Mr. Pollard began his employment at Project Community Capital ("PCC") in 2021.  *See* PSR ¶ 74.  Mr. Pollard returned to work at PCC after his release from the Bureau of Prisons ("BOP").  At the detention hearing before Magistrate Judge Austin, Mr. Pollard read from letters written by Brittni Hardie, his direct supervisor at PCC, and Gina Merritt, the founder of PCC, *see* Exhibits 1 (Letter from Brittni Hardie) and 2 (Letter from Gina Merritt).  Those letters powerfully attest to Mr. Pollard's deep roots in the community, his consistency and reliability, and the positive impact of his work with PCC.  The letters note that PCC is holding open his position for him so that he can resume work upon his release from custody.  Additionally, as noted at the detention hearing, Mr. Pollard has substantial

1

employment history with Torti Gallas and Partners, an architecture and urban design firm where Mr. Pollard first began working in 2019, *see* PSR ¶ 75;

- **Mr. Pollard's history of compliance with location monitoring.** As noted in the PSR, Mr. Pollard was on home detention and location monitoring from September 21, 2020, to September 21, 2023—a period of three years—without apparent incident, resulting in the removal of those conditions prior to sentencing. *See* PSR ¶¶ 6–10. Mr. Pollard subsequently self-surrendered to the BOP on June 25, 2024, to serve the two-year prison sentence for which he is currently on federal supervision;

- **Mr. Pollard's history of reporting to Probation.** At the detention hearing before Magistrate Judge Austin, Mr. Pollard's supervising probation officer, Matthew Ross, told the Court that he and Mr. Pollard were in regular communication prior to Mr. Pollard's detention, including speaking to him often by phone. Mr. Pollard was arrested on the alleged violations of his supervised release at the Probation Office in Baltimore, where he was reporting as directed by Officer Ross;

- **The nature of the alleged violations**, which as noted above, stem from a misdemeanor trespass case that does not suggest a risk of flight or danger and for which Mr. Pollard, if convicted, is facing minimal jail time; and

- **The nature of his prior record**, which, although lengthy, consists largely of non-violent theft and property offenses.

Because Mr. Pollard has satisfied his burden, this Court should uphold Magistrate Judge Austin's carefully constructed and restrictive release order and, upon Probation's approval of Mr. Pollard's residence, allow him to be released pending his violation hearing.

## BACKGROUND

On March 12, 2026, Mr. Pollard reported as directed to the U.S. Probation Office, where he was arrested and subsequently brought to Court for his initial appearance on a petition alleging violations of his supervised release. Mr. Pollard has advised that, prior to reporting to Probation, he asked his supervising officer, Officer Ross, if he was going to be arrested, to which Officer Ross responded that he could not answer that question. Mr. Pollard reported as directed even though he suspected that he was going to be arrested.

2

At the initial appearance, the Court advised Mr. Pollard that he was charged with violating three conditions of his supervision:

- Standard Condition #5, requiring that he reside at a residence approved by Probation;

- Standard Condition #4, requiring that he truthfully answer questions asked by Probation;

- Mandatory Condition #1, requiring that he not commit another federal, state, or local crime.

Each of the alleged violations in the petition refers to Mr. Pollard's December 8, 2025, arrest on the misdemeanor trespass charge currently pending in the Montgomery County District Court. The trespass charge stems from a citizen complaint, in which the complainant alleges that Mr. Pollard trespassed and entered a vacant property on various occasions over a three-month period. All of the alleged violations before this Court are C-Grade violations, which, if proven, would not require revocation of supervised release. The violations carry an advisory guideline range of 8-14 months, with a statutory maximum upon revocation of two years in prison.[1]

The violation petition also references burglary and theft charges currently pending in the Court of Common Pleas of Lancaster County, Pennsylvania, related to allegations that Mr. Pollard conspired with others in 2024 to steal three vehicles from a car dealership in Lancaster. If proven, those charges—which pre-date Mr. Pollard's federal supervision—would not violate his supervision, and Probation does not list the Pennsylvania charges as alleged violations.

On March 13, 2024, the parties appeared before Magistrate Judge Austin for a detention hearing. At the hearing, the Government, Probation, and Mr. Pollard presented lengthy arguments

---

[1] It bears emphasizing that the guideline range is advisory. The U.S. Sentencing Commission states that "[b]ecause supervised release is intended to promote rehabilitation and ease the defendant's transition back into the community, the Commission encourages courts—where possible—to consider a wide array of options to respond to non-compliant behavior and violations of the conditions of supervised release." USSG Ch. 7, Part C (Violations of Supervised Release). The Commission encourages courts to consider "interim steps before revocation." *Id.*

on his release status. Asking the Court to release him with restrictive conditions to include location monitoring, Mr. Pollard proposed that he be released to one of three possible addresses:

- An apartment in Washington, D.C., for which he had recently signed a lease. Mr. Pollard explained that the apartment was located in the same building as Torti Gallas and Partners;

- His cousin Ty Stokes's home, located in Jessup, Maryland—an address that Probation had previously approved. Undersigned counsel spoke prior to the detention hearing with Ms. Stokes, who confirmed that Mr. Pollard was welcome to reside there, including on the condition of home detention with location monitoring; or

- His sister Candice Pollard's home in Accokeek, Maryland.

Magistrate Judge Austin recognized that the governing release standard required Mr. Pollard to establish by clear and convincing evidence that he would not flee or pose a risk of danger to another person or the community. Magistrate Judge Austin also stated that "the burden rests with Mr. Pollard" under Federal Rule of Criminal Procedure 32.1(a)(6). Weighing all the factors, Magistrate Judge Austin found that Mr. Pollard satisfied his burden based on his deep ties to the Maryland area, his employment history, his history of compliance with location monitoring, his history of reporting to Probation, the nature of the alleged violations, and the nature of his prior record. Accordingly, the Court ordered Mr. Pollard's release on conditions to include home detention with location monitoring. ECF No. 9. Magistrate Judge Austin ordered, however, that Mr. Pollard remain in custody until Probation approved his residence. *Id.*

On March 17, 2026, the Government filed a Motion to Stay Release Order and Set Hearing on Revocation of Release Order, which the Court denied the same day for failure to comply with Local Rules, including requirements that the motion be supported by "reasoning and authorities in support of it." ECF Nos. 11 and 12. The Government subsequently filed under seal another Motion to Stay Release Order and Set Hearing on Revocation of Release Order, *see* ECF No. 14, and a Memorandum in Memorandum in Support of its Motion to Revoke the Release Order, *see*

ECF Nos. 15–17.[2] Mr. Pollard, in response, filed a letter informing the Court that Probation had paused its work investigating a suitable residence pending a ruling on the Government's motion to stay the release order. ECF No. 18. Thus, although the Court had not yet ruled on the request for a stay, Mr. Pollard's release order was effectively stayed because he cannot be released until Probation approves his residence. *Id.* The Government, in reply, submitted a letter in which it reiterated its request for a stay. *See* ECF No. 20. The Court granted the Government's request to stay the release order and set a hearing for March 25, 2026, to determine Mr. Pollard's release status. ECF No. 19.

The violation of supervised release hearing in Mr. Pollard's case is scheduled for May 6, 2026—meaning that, if ordered detained, Mr. Pollard would be held for nearly two months before adjudicating the violations in this case.

## **ARGUMENT**

Magistrate Judge Austin correctly found that release was required in Mr. Pollard's case. Rule 32.1(a)(6) of the Federal Rules of Criminal Procedure expressly provides that a magistrate judge may release an individual under 18 U.S.C. § 3143(a)(1) pending alleged violations of supervised release. Under 18 U.S.C. § 3143(a)(1), the Court shall order the release of the individual under supervision, in accordance with 18 U.S.C. § 3142(b) or (c), upon finding that he has met his burden of showing by clear and convincing evidence that he will not flee or pose a danger to any other person or to the community.

Section 3142(b), in turn, requires release on personal recognizance or unsecured appearance bond, "unless the judicial officer determines that such release will not reasonably

---

[2] With the exception of Exhibit 1 to the Government's Memorandum, Mr. Pollard opposes the sealing of the Government's Memorandum and attached exhibits, and he will be filing a separate response to the Government's Motion to Seal.

assure the appearance of the person as required or will endanger the safety of any other person or the community." If the Court determines that release under § 3142(b) "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community," the Court nevertheless shall order pretrial release of the individual subject to the conditions that the Court determines will provide those reasonable assurances. 18 U.S.C. § 3142(c)(1). Those conditions must include the condition that the person not commit a new crime during release and cooperate in the collection of a DNA sample if one is authorized, as well as "the least restrictive further condition, or combination of conditions, that [the Court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(A)–(B).

In Mr. Pollard's case, Magistrate Judge Austin correctly determined that he met his burden of showing by clear and convincing evidence that he would not flee or pose a risk of danger if released. Thus, the Court was required to release Mr. Pollard under the least restrictive conditions that would reasonably assure his appearance in Court and community safety. Magistrate Judge Austin crafted a careful and thoughtful release order to provide those reasonable assurances, including conditions of restrictive home detention, location monitoring, travel restrictions, and release only after Probation approves his residence. The Court should affirm this ruling.

I.      **Mr. Pollard has established by clear and convincing evidence that he will appear in Court as required.**

Magistrate Judge Austin cited numerous factors in correctly determining that Mr. Pollard met his burden of showing that he will appear in Court as required. Those factors—together with additional information and corroboration Mr. Pollard has gathered since then—satisfy his burden, and the Government has not offered any information or arguments that change this calculation.

**First**, Mr. Pollard has long-standing ties to Maryland.  As noted in the PSR, Mr. Pollard was born in Washington, D.C., and has lived and worked in the Maryland and D.C. area his entire life.  *See* PSR ¶¶ 56, 58, 73–77 .  He graduated from high school in Maryland, attended community college in Maryland, and his family resides in Maryland.  *See* PSR ¶¶ 56, 68–69.

**Second**, Mr. Pollard has substantial and verified employment history.  In 2021, Mr. Pollard began working at PCC—a company that provides resources and services to individuals and businesses in underserved communities, *see* PSR ¶ 74, and he returned to work at PCC after his release from BOP custody.  Mr. Pollard's direct supervisor, Brittni Hardie, and PCC's founder, Gina Merritt, have corroborated his employment.  *See* Exhibit 1; Exhibit 2.  Ms. Hardie has also provided two recent paystubs, as well as Mr. Pollard's 2025 1099 Form.  *See* Exhibit 3 (PCC Employment Records).

Both Ms. Hardie and Dr. Merritt offer powerful character references for Mr. Pollard.  Ms. Hardie describes Mr. Pollard as "a dedicated member of our organization," who "has consistently demonstrated reliability, leadership, and a strong commitment to the communities we serve." Exhibit 1.  She writes that Mr. Pollard "engages directly with residents, small business owners, and community partners, helping to coordinate outreach initiatives, support programming, and ensure consistent communication between our organization and the public."  *Id.*  She calls Mr. Pollard "an important asset to our team," and writes that she is "confident he will comply with all court requirements while continuing to fulfill his professional obligations."  *Id.*  Dr. Merritt likewise describes Mr. Pollard as "a dedicated and valued member of our organization," who "was promoted to the role of Community Development Manager because of his leadership, consistency, and deep commitment to the people we serve." Exhibit 2.  Dr. Merritt states that this title "reflects the level of trust and responsibility he carries within our organization," and that the organization

7

"believe[s] in him." *Id.* Dr. Merritt calls Mr. Pollard "dependable, accountable, and respected by residents and colleagues alike." *Id.* Finally, both Ms. Hardie and Dr. Merritt confirm that PCC is holding open Mr. Pollard's position for his eventual return home.

Mr. Pollard also has substantial employment history with Torti Gallas and Partners, an architecture and urban design firm where Mr. Pollard first began working in 2019. Founding partner Thomas Gallas has written a character letter for Mr. Pollard and provided paystubs as further corroboration of his employment. *See* Exhibit 4 (Letter from Thomas Gallas). Mr. Gallas writes that he has known Mr. Pollard since 2017, when he met him at the graduation ceremony for the Georgetown University PIVOT Program. Mr. Gallas hired Mr. Pollard to "help us with logging shop drawings for our review on several construction projects;" "Mr. Pollard worked hard and completed his tasks accurately and timely." *Id.* Mr. Gallas explains that he got to know Mr. Pollard through conversations early in the morning, before others had arrived at the office. As a result, he invited Mr. Pollard to a "community meeting[] as we engaged with the residents at one of our public housing neighborhood revitalization projects." *Id.* Mr. Gallas states that he "was honestly amazed at how much more information and insight [Mr. Pollard] was able to gather from the residents than me and my team." *Id.* Mr. Gallas writes about how Mr. Pollard's experiences inspired him to try to start his own company, Perspective Engagement. *Id.*; *see also* PSR ¶ 73. Taken together, Ms. Hardie's, Dr. Merritt's, and Mr. Gallas's letters attest to Mr. Pollard's accountability, dependability, and sincere commitment to his community.[3]

**Third**, Mr. Pollard has a documented history of self-surrendering and a recent three-year track record of compliance with the conditions of home detention and electronic monitoring. As

---

[3] Kenya Hunter and Lance Phillips, Sr., offer additional character references for Mr. Pollard. *See* Exhibit 5 (Letter from Kenya Hunter) ("During one of the most difficult times in my life . . . Corey stepped in and supported my family in ways I will never forget."); Exhibit 6 (Lance Phillips, Sr.) ("Just like a brother, that man picked me up, and held me through my darkest days.").

noted in the PSR, on September 8, 2020, Mr. Pollard was ordered released on a $10,000 unsecured bond with pretrial supervision, including home detention and location monitoring. PSR ¶ 5. Due to a detainer, however, Mr. Pollard could not be immediately released. PSR ¶ 5. When Mr. Pollard was mistakenly released despite the detainer, he turned himself in to U.S. Marshals Service in Maryland. PSR ¶ 6. On September 21, 2020, Mr. Pollard was released when the detainer was lifted. PSR ¶ 6. For the next three years, Mr. Pollard was subject to home detention and electronic monitoring. PSR ¶ 10. Those three years were apparently successful, as the Court modified his bond conditions on September 21, 2023, to remove home detention and location monitoring. PSR ¶ 10. Even without those restrictive conditions, Mr. Pollard self-surrendered to the BOP on June 25, 2024, to serve the two-year prison sentence for which he is currently on federal supervision. The Government cannot credibly claim that Mr. Pollard would fail to appear in Court or surrender to serve a sentence when he has a recent and documented history of doing so.

**Fourth**, Mr. Pollard has a history of reporting to Probation. As noted above, Mr. Pollard was arrested on the instant violation petition when he was reporting to Probation as directed by his supervising officer—and he did so despite suspecting, given his recent release from state custody, that he would be arrested. Officer Ross told the Court at the detention hearing that he and Mr. Pollard were in regular communication prior to his detention, including speaking often by phone. It appears that Mr. Pollard was also in email communication with Officer Ross after he was released from state custody. Mr. Pollard's sister forwarded two email communications to undersigned counsel that Ms. Pollard advised are messages Mr. Pollard sent to Officer Ross. In the first email dated January 9, 2026, Mr. Pollard advised Officer Ross that he was recently detained "for about 30 days" based on "an old detainer from Lancaster County, Pennsylvania." *See* Exhibit 7 (Jan. 9, 2026, Email). Mr. Pollard advised that his employment status was "still

9

being determined" now that he had been released and that he would be meeting with his employer at Torti Gallas "to discuss next steps." *Id.* Mr. Pollard wrote that he "should also have access to my phone within the next day," and in the meantime, he provided his wife's phone number. *Id.* He advised Officer Ross about an issue he had encountered when paying his restitution and stated that, "[t]o avoid any problems," he made "two payments today" and "contacted Pay.gov to have the other previous payments applied to the correct account." *Id.* Finally, he asked Officer Ross to "[p]lease let me know if you need anything further from me." *Id.*

The second email forwarded by Mr. Pollard's sister was dated March 10, 2026, and had an attachment containing the lease agreement for Mr. Pollard's apartment in Washington, D.C. *See* Exhibit 8 (Mar. 10, 2026, Email); Exhibit 9 (Apartment Lease). In the email, Mr. Pollard advised that he was "attaching [his] full lease agreement." Exhibit 8. Mr. Pollard stated that "[t]he original move-in date was scheduled for February 15; however, due to circumstances, I was not able to move in until March 3." *Id.*[4] Mr. Pollard "apologize[d] for the lack of communication"— explaining that he had "incarcerated for 31 days" while he contested extradition to Pennsylvania, and then he was "taken back into custody eight days later," at which point he "stopped contesting it [extradition] and allowed them to proceed." *Id.* He advised Officer Ross that he "will make sure to be present at our appointment on Thursday[] at 11am." *Id.* Mr. Pollard did indeed attend that appointment, at which he was arrested and brought to Court for the initial appearance on the violation petition.

---

[4] In recorded calls provided by the Government, Mr. Pollard indicates that he had not yet moved all of his things into the apartment (which makes sense given that he was in and out of state custody beginning in December 2025), but states that he had set up internet and electrical/Pepco accounts for the apartment. Mr. Pollard offered Probation the opportunity to conduct a home inspection at the apartment. On March 17, 2026, undersigned counsel provided Probation with a copy of the lease agreement received from Ms. Pollard's sister and advised that Ms. Pollard should be able to help arrange getting Probation into the apartment.

The above emails provided by Mr. Pollard's sister confirm that he was reporting to Probation and that, if released, he will continue reporting. Moreover, if released by this Court, Mr. Pollard will have two ankle monitors—one on each ankle. When he was ordered released by the Court of Common Pleas in Pennsylvania, it included the condition of location monitoring. Mr. Pollard has been wearing an ankle bracelet since then. In the recorded jail calls provided by the Government, Mr. Pollard told his family that he asked the Chesapeake Detention Facility not to cut off the ankle monitor so that he would not risk falling out of compliance with the release conditions. He also asked his family on multiple occasions to contact the Pennsylvania Bail Administration to ensure they knew his whereabouts. The Government has argued that Mr. Pollard should be detained because it claims he was not truthful with Probation about where he was living.[5] But, with two ankle monitors, there will be no question about where Mr. Pollard is residing, and the release conditions ordered by Magistrate Judge Austin leave absolutely no ambiguity that Mr. Pollard must reside every night at the same address approved by Probation.

**Finally**, the alleged violations do not suggest a risk of flight. The alleged violations stem from a misdemeanor trespass case in Montgomery County, for which Mr. Pollard faces a maximum possible jail term of 90 days. It appears that he has already served over a month in Maryland state custody. Accordingly, if convicted, Mr. Pollard faces less than two additional months in custody. The alleged violations stemming from the trespass case do not require revocation and have an advisory guideline range of 8-14 months. Mr. Pollard has every motivation to resolve the Maryland trespass case so that he can also resolve the violations pending in this

---

[5] The Government also claims that Mr. Pollard was "coaching" his family about what to say to Probation, but in a call quoted by the Government, Mr. Pollard asks his wife to tell his family to "tell the truth." ECF No. 15 at 27.

Court.  Detaining Mr. Pollard would likely impede his ability to resolve his state charges, as he may not be transported from federal custody for upcoming court dates.

In sum, because Mr. Pollard has established by clear and convincing evidence that he will appear in Court, release is required.

### II. Mr. Pollard has established by clear and convincing evidence that his release will not pose a risk of danger.

Magistrate Judge Austin correctly determined based on Mr. Pollard's prior criminal history and the alleged violations in this case that he would not pose a risk of danger if released.  Nothing in the Government's Memorandum establishes otherwise.

### A. Mr. Pollard's record is comprised largely of theft and property offenses that do not establish a history of violence, threats to another person, or firearm use or possession.

Although lengthy, Mr. Pollard's record is comprised mainly of theft and property offenses that do not involve violence, threats, or firearms.  There is an enormous difference between motor vehicle theft and carjacking; Mr. Pollard's record is totally devoid of the latter.  The Government emphasizes a 2009 conviction for conspiracy-robbery with dangerous weapon, for which the PSR suggests that Mr. Pollard acted as the get-away driver.  PSR ¶ 36.  But that conviction—which occurred more than 17 years ago when Mr. Pollard was a young man in his twenties and did not appear to involve physical harm to any individual—is an outlier in his record.  Mr. Pollard's record is otherwise devoid of violence, threats to another person, or firearm use or possession.

Nevertheless, the Government argues that the Court should find Mr. Pollard poses a risk of danger because "'danger to the community' under the Bail Reform Act is not limited to physical violence" but rather includes the risk of "continued economic harm or property crimes."  ECF No. 15 at 17.  Even assuming *arguendo* that "danger" in the Bail Reform Act refers to risks other than

physical violence,[6] the Government's argument fails because Mr. Pollard has established by clear and convincing evidence that the Court can reasonably assure the safety of the community with the ordered release conditions, including home detention and location monitoring. As noted above, Mr. Pollard was on electronic monitoring for a period of three years, from September 21, 2020, to September 21, 2023. *See* PSR ¶¶ 6, 10–12. During that time, it does not appear there were any significant violations, let alone new criminal charges. *Id.* Mr. Pollard's successful three-year track record provides ample assurance for this Court that he will comply with all ordered release conditions.

The Government argues that Mr. Pollard cannot be trusted not to commit a new offense because the alleged conduct underlying the Pennsylvania theft and burglary charges occurred while Mr. Pollard was pending self-surrender to the BOP. Those charges have not yet been adjudicated and, at this point, represent mere allegations. In any event, the charges do not defeat a finding that Mr. Pollard has met his burden because the alleged conduct underlying those charges occurred after the Court removed the conditions of home detention and location monitoring. *See* PSR ¶ 10. Mr. Pollard embraces all the conditions ordered by Magistrate Judge Austin, which will place him under much more onerous release conditions than those in place at the time of the alleged conduct in Pennsylvania. The question before this Court—as made clear by one of the cases cited in the Government's Memorandum, *see* ECF No. 15 at 18—is not whether the safety of the community can be "absolutely guaranteed," but instead whether it can be "reasonably assured." *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990). The restrictive release conditions ordered in Mr. Pollard's case provide those reasonable assurances.

---

[6] The Government cites *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988), for the proposition that "[t]he Fourth Circuit has recognized that the concept of danger encompasses the risk that a defendant will continue to engage in criminal conduct," but *King* appears to be an Eleventh Circuit case.

**B. The alleged violations are non-violent in nature, and nothing in the Government's Memorandum establishes otherwise.**

The alleged violations—all of which are C-grade violations stemming from the pending misdemeanor trespass case in Montgomery County—are non-violent in nature. However, the Government claims that Mr. Pollard poses a risk of danger because his wife indicated in a recorded call that she hired a "PI" to conduct an investigation into the complainant in the trespass case. As an initial matter, actions taken by Mr. Pollard's wife—whom Mr. Pollard has never proposed as a third-party custodian and with whom he has indicated he does not intend to reside upon his release[7]—do not bear on the release calculus in his case. In any event, both Mr. Pollard and Ms. Goode—who face state charges based on a citizen complaint filed by the complainant—have constitutional rights to prepare a defense in their cases. Part and parcel of those constitutional rights is the ability to conduct a reasonable investigation of the charges lodged against them, which includes an investigation into the complainant, whose allegations will be at central issue in their cases. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); *see also Strickland v. Washington*, 466 U.S. 668, 690–91 (1984) (counsel has a Sixth Amendment duty to conduct reasonable investigations).

The Government also cites alleged statements in two recorded calls that it believes suggest Mr. Pollard "want[s] to take [the complainant's] house." ECF No. 15 at 33. There is absolutely no allegation in the complaint filed in Montgomery County District Court that Mr. Pollard ever

---

[7] The Government's Memorandum relays a conversation between Probation, Mr. Pollard's sister, and defense counsel that occurred after the detention hearing before Magistrate Judge Austin. *See* ECF No. 15 at 26. The Memorandum states that Mr. Pollard's sister and defense counsel stated that Mr. Pollard and his wife were not in communication. That was not what was said. It was proffered that Mr. Pollard and his wife do not currently reside together—not that they are not in touch.

14

trespassed or attempted to trespass on the complainant's property, let alone that he attempted to "take" the complainant's home. There is no allegation in the complaint that Mr. Pollard had any contact or interactions with the complainant at all. Indeed, in a recorded call with his wife on March 12, 2026, Mr. Pollard, referring to the complainant, stated that he "keep[s] praying and asking to let me be." The sole allegations in the complaint relate to entering an unoccupied property owned by a bank. The government's unsupported conjecture that "it doesn't seem like a very unreasonable or unrealistic fear that the defendant and his wife could do the same thing in their homes" is not enough to defeat Mr. Pollard's showing that his release will not pose a danger, particularly when he would be subject to restrictive conditions of home detention, location monitoring, and travel limitations. ECF No. 15 at 33.

Finally, the Government cites allegations from the complainant that he has received "multiple threatening and intimidating phone calls" in contending that Mr. Pollard's release would pose a risk of danger to the complainant. ECF No. 15.2 ¶¶ 10–11. This Court should not rely on these vague and uncorroborated claims, which lack any indication that Mr. Pollard made, directed, or had any involvement in the alleged phone calls. The Government raised similar allegations during the detention hearing before Magistrate Judge Austin; but then, as now, the Government offers no information about what was said during the calls with the complainant, who purportedly made the calls, or when the calls were made. Without any specifics, this Court has no ability to assess the veracity of these claims, let alone determine whether Mr. Pollard is in any way connected to them.

Absent live testimony from the complainant, the Court should not consider the affidavit from the complainant or the Government's proffer that the complainant has received threatening calls. As explained by then-Magistrate Judge James K. Bredar in *United States v. Hammond*, 44

F. Supp. 2d 47 (D. Md. 1999), "the case law supporting detention upon government proffers in no way requires a judicial officer to accept or accredit proffered evidence, nor does that case law assume that proffers in lieu of live testimony are appropriate in every case." *Id.* at 746. Judge Bredar continued:

> When the government is able to proffer evidence that reflects ample and substantial corroboration for its contention that a defendant has committed an offense and is dangerous or a flight risk, efficiency and the need to conserve scarce judicial resources justify accepting that proffer in lieu of live testimony; and such proffers that are reflective of weighty and broad evidence of guilt, when considered with other information such as criminal history and lack of ties to the community, can be entirely proper bases for orders of detention. On the other hand, when the evidence proffered is the uncorroborated statement(s) of one or two police officers who allegedly observed a single act committed by the defendant, and when there is no other evidence proffered in support of the eyewitness testimony, the Court should consider the proffer with great care and accord it limited weight. Before entering any order of detention in such a case, the judicial officer should require the government to present live testimony able to withstand confrontation, long- and well-recognized as the "greatest legal engine ever invented for the discovery of truth."

*Id.* at 746 (quoting *California v. Green*, 399 U.S. 149, 158 (1970)). Thus, in *Hammond*, Judge Bredar ruled that the Government could not proceed with hearsay evidence at a detention hearing where it claimed that two Baltimore City Police Officers witnessed the defendant remove a firearm from his waistband during flight from officers. *Id.* at 744, 746–47. Judge Bredar ordered the Government "to produce one or both of the arresting officers and to then present their testimony as to the facts surrounding the arrest of the defendant." *Id.* at 747.

The case for live testimony from the complainant in this case is even stronger here than in *Hammond*, where the Government proffered that two law enforcement witnesses observed the defendant commit a crime. Here, the Government relies on the affidavit of a single citizen witness that is uncorroborated and entirely lacking in any specificity. In the absence of testimony, the

16

Court should place no weight on the affidavit or the Government's proffer, which, in any event, do not establish any link between the calls allegedly received by the complainant and Mr. Pollard.

In sum, because Mr. Pollard has established by clear and convincing evidence that he will appear in Court as required and his release would not endanger another person or the community— and nothing proffered by the Government defeats this showing—this Cout must order his release.

## CONCLUSION

Mr. Pollard respectfully asks this Court to uphold the Order Setting Conditions of Release in his case and order that Probation promptly undertake an investigation into his proposed residences to determine suitability.  In accordance with the Order Setting Conditions of Release, Mr. Pollard should be released upon Probation's identification of a suitable residence.  A proposed Order is attached.

Respectfully submitted,

JAMES WYDA
Federal Public Defender


     /s/
SHARI SILVER DERROW
Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: 410-962-3962
Fax: 410-962-3976
Email: shari_derrow@fd.org

17